## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Terrence T. Williams, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21 C 1563 |
| v. | ) | |
| | ) | Hon. Franklin U. Valderrama |
| | ) | |
| Oculeye, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Terrence T. Williams (Plaintiff), formerly a pretrial detainee at the Will County Adult Detention Facility (WCADF), brought this *pro se* civil rights action under 42 U.S.C. §1983, alleging that medical staff at WCADF placed him on suicide watch and close observation status from February 23 through March 3, 2021, as a means of punishment. Plaintiff also alleges that during this time he was subjected to unconstitutional conditions of confinement and was deprived of due process in connection with a disciplinary hearings held on March 10, 2021.

Both the Medical Defendants and the Will County Defendants have filed motions for summary judgment. Plaintiff did not file a response, despite being warned that failure to respond would result in consideration of the motions without his response. For the reasons that follow, the Court grants both motions for summary judgment.

## BACKGROUND

### I.      Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for

summary judgment in this court. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up).[1] Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3).

Because Plaintiff is proceeding *pro se*, Defendants served him with the required "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. Nos. 173, 188.) Plaintiff did not respond to either motion despite being given an opportunity to do so and despite being warned that

---

[1] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

failure to respond would result in consideration of the motions without the benefit of a response. (Dkt. Nos. 167, 191.[2]) Both sets of Defendants subsequently moved to have the Court deem admitted the uncontroverted statements of facts offered in support of their motions. (Dkt. Nos. 193, 195.) The Court grants these motions to the extent that the asserted facts are supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

The Court observes that Plaintiff's failure to strictly comply with Local Rule 56.1 is not a basis for automatically granting Defendants' motions. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond*, 442 F.3d at 608. The Court applies these standards in evaluating the evidence.

## II.     Relevant Facts[3]

At all times relevant times, Plaintiff was a pretrial detainee at the WCADF

---

[2]After the Court's final deadline, Plaintiff submitted a document titled "Notice of Change of Address & Pardon for Delay in Prosecution" (Dkt. No. 194) requesting that all motions in this and six of his other cases be sent to him "in hard copies" and requesting a "grace period" to respond. Plaintiff later submitted a motion to "reopen" this case that did not substantively respond to the summary judgment motions or explain his failure to do so. (Dkt. No. 200.) The docket reflects that Plaintiff was properly served with the motions in this case. He has to date not responded to the motions for summary judgment. He also did not respond to Defendants' motions to have their undisputed statements of fact deemed admitted. To the extent that Plaintiff's filings could be interpreted as a request for additional time to respond to the motions for summary judgment, the Court denies that request. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 605–06 (7th Cir. 2006) (district court has authority to set deadlines and discretion to enforce them).

[3]This Court has jurisdiction under 28 U.S.C. § 1331, and venue is appropriate under 28 U.S.C. § 1391, because a substantial part of the events giving rise to this claim occurred at the WCADF which is located in Will County, within the Northern District of Illinois. (*See* Will Co. Defs.' SOF, Dkt. No. 172, at ¶¶ 6-9.)

(Will Co. Defs.' SOF, Dkt. No. 172, at ¶ 1.). Defendant Dale Santerelli served as the warden of WCADF (*Id.* at ¶ 2.), Defendant Tony Richards was a sergeant at WCADF (*Id.* at ¶ 3.), Defendant Stuart Taylor was the chief deputy at the facility (*Id.* at ¶ 4.), and Defendant Andrea Perry, now Andrea Kelly, was a classification specialist at WCADF (*Id.* at ¶ 5.) (collectively, Will County Defendants).

Plaintiff alleges that the Will County Defendants, Warden Santerelli, Chief Deputy Taylor, and Sgt. Richards violated his due process rights by allowing him to be placed on close observation and suicide watch as a form of punishment, and by subjecting him to unconstitutional conditions of confinement while he was on suicide watch. (Will Co. Defs.' SOF, Dkt. No. 172, at ¶¶ 6-7.) Plaintiff further asserts that Sgt. Richards and Defendant Kelly violated his due process rights during the March 10, 2021 display hearing. (*Id.* at ¶¶ 7-8.)

At all relevant times, Dr. Babatunde Okuleye, referred to in the complaint as "Dr. Oculeye", was employed by Wellpath LLC as a physician in the Health Services Unit at the WCADF. (Med. Defs.' SOF, Dkt. No. 184, at ¶ 2.) Theodore Nitsche (MHP Nitsche), referred to in the complaint as "Theo," was employed by Wellpath as a mental health professional in the Health Services Unit at the WCADF. (*Id.* at ¶ 3.) Valerie Gier (MHP Gier) sued as "Valarie," was employed by Wellpath as a mental health professional in the Health Services Unit at the WCADF. (*Id.* at ¶ 4.) Chris Sandvick (MHP Sandvick), sued as "Chris", was employed by Wellpath as a mental health professional in the Health Services Unit at the WCADF (*Id.* at ¶ 5.), (collectively, Medical Defendants).

4

With respect to the Medical Defendants, Plaintiff alleges that they violated his constitutional rights by subjecting him to close observation status and suicide watch as a form of punishment. (*Id.* at ¶ 8.) He further alleges that, while on this watch status, he was subjected to unconstitutional conditions of confinement, including a clogged toilet, feces in his chuckhole, a cold cell, and only a paper gown for warmth. (*Id.* at ¶¶ 9-10.)

By way of background, WCADF operates a heating, ventilation, and air-conditioning system that regulates temperature throughout the facility, including in detainee cells, and generally ensures that all areas of the facility remain at a typical room temperature. (*Id.* at ¶ 10.) At all times relevant times, WCADF policy emphasized providing a safe and sanitary working environment for detainees and staff. (*Id.* at ¶ 11.) To that end, WCADF established rules and implemented procedures to ensure cells, housing units, and other areas of WCADF were clean and in good repair. (*Id.*)

Additionally, WCADF policy required regular inspections of the facility's operations and physical plant to ensure security, safety, and sanitation, thereby, fostering a safe and secure environment for staff and inmates alike. (*Id.* at ¶ 12.) Sergeants are required to conduct a daily patrol of all areas occupied by detainees, (*Id.*), while correctional officers are required to inspect housing units and promptly address all housekeeping or maintenance issues, including detainee complaints related to cell cleanliness. (*Id.*)

In February and March of 2021, Plaintiff was housed in the Medical Unit of

the WCADF. (*Id.* at ¶ 13.) On February 20, 2021, Plaintiff was placed on suicide watch at the recommendation of medical professionals at the WCADF. (*Id.* at ¶ 14.) At all relevant times, WCADF maintained a policy of placing detainees on suicide watch when such action was recommended by medical providers. (*Id.* at ¶ 15.)

Close observation is a measure defined similarly to suicide watch. (*Id.* at ¶ 16.) Under both suicide watch and close observation, detainees are evaluated daily by medical providers, who subsequently recommend whether detainees should remain on or be removed from suicide watch or close observation. (*Id.* at ¶ 17.)

WCADF policy required deference to medical providers' recommendations regarding the placement or removal of detainees from suicide watch or close observation. (*Id.* at ¶ 18.) These medical providers are contracted through a private company and are not employed by Will County. (*Id.* at ¶ 19.)

When a detainee is placed on suicide watch, his personal items, including clothing, bedding, and any items that can be used to commit self-harm are removed from the detainee's cell for safety reasons. (*Id.* at ¶ 20.) While on suicide watch, a detainee is clothed in a paper gown that is designed to rip under pressure to ensure that the detainee cannot use the paper gown to self-harm. (*Id.* at ¶ 21.)

If a detainee on suicide watch or close observation had an issue or grievance stemming from those measures, under WCADF policy, such concerns are to be addressed by medical providers. (*Id.* at ¶ 22.) If the medical providers recommended a change to placement while on suicide watch or close observation, or that a detainee on watch be provided with additional items, WCADF staff would defer to that

recommendation, within reason. (*Id.* at ¶ 23.)

MHP Gier described the observation process as follows. At WCADF, an inmate may be subject to increased levels of observation depending on the inmate's safety and mental health needs. (Med. Defs.' SOF, Dkt. No. 184, at ¶ 15.) The first level of observation is close observation. (*Id.* at ¶ 16.) On close observation status, an inmate is housed in the Medical Unit and is checked on by correctional officers at least every 10 minutes. (*Id.* at ¶ 17.) The second level of observation is suicide watch, during which an inmate is under continuous surveillance to ensure that he does not hurt himself or others. (*Id.* at ¶¶ 18-19.) Inmates on suicide watch are not allowed to have blankets and are given paper gowns to wear for their safety. (*Id.* at ¶¶ 20-21.)

Upon entering WCADF on June 1, 2020, Plaintiff was screened by a non-Defendant nurse in the Health Services Unit. (*Id.* at ¶¶ 12-13.) At that time, Plaintiff reported previous mental health diagnoses of anxiety disorder, obsessive-compulsive disorder, and attention-deficit hyperactivity disorder. (*Id.* at ¶ 14.)

On or around July 4, 2020, Plaintiff was placed on close observation status after voicing thoughts of self-harm to staff and correctional officers. (*Id.* at ¶¶ 22-23.) MHP Sandvick then met with Plaintiff while he was on close observation status to assess his mental health needs. (*Id.* at ¶ 23.)

During the July 4 assessment, Plaintiff stated that he was placed on close observation because he told staff he was experiencing suicidal ideations. (*Id.* at ¶ 24.) Plaintiff denied that he was actually suicidal, however, and stated that he was angry. (*Id.* at ¶ 25.) Plaintiff denied any current suicidal ideations, plans, or history of

7

suicide attempts. (*Id.* at ¶ 26.) After the assessment, MHP Sandvick discharged Plaintiff from close observation status after determining he was not a threat to himself or others. (*Id.* at ¶ 27.)

On July 8, 2020, Plaintiff was again placed on close observation status after verbalizing a desire to harm himself. (*Id.* at ¶ 28.) At that time, a non-Defendant mental health professional met with Plaintiff and assessed his safety and mental health needs. (*Id.* at ¶ 29.) Following the assessment, the mental health worker discharged Plaintiff from close observation status after determining that he was not an active threat to himself or others. (*Id.* at ¶ 30.)

On July 11, 2020, MHP Sandvick met with Plaintiff to assess his mental health needs after Plaintiff made a "suicidal gesture" to healthcare staff. (*Id.* at ¶ 31.) At this time, Plaintiff reported suicidal ideations on three occasions and aggressive ideations toward certain correctional officers. (*Id.* at ¶ 32.) Following the consultation, MHP Sandvick determined that Plaintiff posed an active threat of harm not only to himself but to others and placed him on close observation status. (*Id.* at ¶ 33.) On July 14, 2020, a different, non-Defendant mental health professional discharged Plaintiff from close observation status after determining that he did not pose an active threat of harm to himself or others. (*Id.* at ¶¶ 34-35.)

On July 25, 2020, Plaintiff reported to a correctional officer that he was suicidal. (*Id.* at ¶ 36.) Plaintiff then reported to a responding nurse that he was not suicidal but wanted to talk to a mental health professional. (*Id.* at ¶ 37.) MHP Sandvick met with Plaintiff that day. (*Id.* at ¶ 38.) Plaintiff subsequently was placed

on close observation status after telling a non-Defendant nurse that he was going to harm himself. (*Id.* at ¶¶ 39-40.)

On July 27, 2020, a non-Defendant mental healthcare provider met with Plaintiff while he was on close observation status to assess his safety and mental healthcare needs. (*Id.* at ¶ 41.) After doing so, the provider determined that Plaintiff was not an active threat to himself or others and discharged him from close observation status. (*Id.* at ¶ 42.)

On September 28, 2020, Plaintiff reported to a correctional officer that he wanted to kill himself. (*Id.* at ¶ 43.) A non-Defendant nurse attended to Plaintiff, and he denied that he said that. (*Id.* at ¶¶ 44-45.) The nurse placed Plaintiff on close observation status until a mental health professional had an opportunity to assess him. (*Id.* at ¶ 46.) On September 29, 2020, a non-Defendant mental health professional assessed Plaintiff while he was on close observation status, determined that he was not an active threat to himself or others, and discharged Plaintiff from close observation status. (*Id.* at ¶¶ 47-48.)

On January 27, 2021, Plaintiff reported to a jail staff member that he wanted to hurt himself and subsequently was placed on close observation status. (*Id.* at ¶ 49.) MHP Sandvick met with Plaintiff later that day to assess his safety and mental health needs. (*Id.* at ¶ 50.) After doing so, MHP Sandvick determined that Plaintiff was not an active threat to himself or others and cleared him from close observation status. (*Id.* at ¶ 51.)

On February 16, 2021, MHP Sandvick placed Plaintiff on close observation

status for threatening to jump over the second-story railing. (*Id.* at ¶ 52.) Shortly after placing Plaintiff on close observation status, MHP Sandvick upgraded Plaintiff to suicide watch because Plaintiff continued to threaten to jump over the second-story railing to harm himself. (*Id.* at ¶ 53.)

In the initial suicide watch assessment, MHP Sandvick walked Plaintiff through various prompts related to self-harm. (*Id.* at ¶ 54.) During the screening, Plaintiff admitted that in the past month, he: (1) wished he was dead or that he could go to sleep and not wake up; (2) thought about how he might kill himself; (3) had intention of acting on these thoughts; (4) had worked out the details of how to kill himself; (5) intended to carry out the plan; and (6) had taken actions to end or prepare to end his life. (*Id.* at ¶ 55.)

The next day, on February 17, 2021, MHP Sandvick met with Plaintiff while he was on suicide watch to assess his safety and mental health needs. (*Id.* at ¶ 56.) MHP Sandvick determined that Plaintiff could be downgraded from suicide watch to close observation status. (*Id.* at ¶ 57.) MHP Sandvick downgraded Plaintiff based on his observations that Plaintiff was agitated but ultimately cooperative, was able to advocate for himself, knew how to access mental health services, and denied suicidal ideations. (*Id.* at ¶ 58.)

Two days later, on February 19, 2021, MHP Sandvick put Plaintiff back on suicide watch after Plaintiff told a nurse he wanted to hurt himself and did not feel safe there. (*Id.* at ¶ 59.) The next day, MHP Sandvick met with Plaintiff to assess his safety and mental health needs. (*Id.* at ¶ 60.) After the assessment, MHP Sandvick

determined that Plaintiff could be downgraded to close observation status after Plaintiff denied current suicidal ideations, intentions, or plans and reported that he was compliant with his medication. (*Id.* at ¶ 61.)

Within 30 minutes after being downgraded to close observation status, Plaintiff attempted to hang himself from a second-story railing with a bedsheet. (*Id.* at ¶ 62; *see also* Will Co. Defs.' SOF, Dkt. No. 172, at ¶ 24.) Plaintiff was found hanging from the second story railing with a sheet around his neck. (*Id.* at ¶ 63.) Plaintiff also smeared feces all over the glass windows in the dayroom. (*Id.* at ¶ 64.) MHP Sandvick met with Plaintiff after his suicide attempt and placed him on suicide watch after determining that he posed an active threat of harm to himself. (*Id.* at ¶¶ 64-65.) Plaintiff testified that he did not recall this incident. (Will. Co. Defs.' SOF, Dkt. No. 172, at ¶ 25.) But he admitted that he made comments prior to February 2021 indicating that he was suicidal. (*Id.* at ¶ 26.)

Plaintiff remained on some form of watch status until March 3, 2021. (*Id.* at ¶¶ 27-28, 31.) Plaintiff was evaluated each day while on suicide watch, as set forth below. (*Id.* at ¶ 29.) While on suicide watch, Plaintiff was allowed only to wear a paper gown. (*Id.* at ¶ 32.)

On February 22, 2021, MHP Gier met with Plaintiff while he was on suicide watch to assess his safety and mental health needs. (Med. Defs.' SOF, Dkt. No. 184, at ¶ 66.) During the assessment, Plaintiff denied suicidal ideations, and MHP Gier downgraded him from suicide watch to close observation status. (*Id.* at ¶¶ 67-68.)

Turning to the events directly underlying Plaintiff's complaint, on February

11

23, 2021, MHP Nitsche met with Plaintiff while he was on close observation status to assess his safety and mental health needs. (*Id.* at ¶ 69.) During this consultation, Plaintiff was belligerent and argumentative. (*Id.* at ¶ 70.) Plaintiff would not allow MHP Nitsche to speak without interruption. (*Id.* at ¶ 71.) Plaintiff then began to masturbate in front of MHP Nitsche. (*Id.* at ¶ 72.) MHP Nitsche told Plaintiff to stop masturbating, but he ignored that instruction and continued. (*Id.* at ¶¶ 73-74.) The assessment subsequently ended. (*Id.* at ¶ 75.) MHP Nitsche concluded that Plaintiff needed to remain on close observation status because he was not cooperative and had been placed on watch and removed from watch several times recently. (*Id.* at ¶ 76.) MHP Nitsche added that more time under close observation was required to assess Plaintiff's mental state and ability to remain safe. (*Id.* at ¶ 77.)

That same day, February 23, 2021, a non-Defendant nurse contacted Dr. Okuleye to update him on Plaintiff's behavioral problems and attempt to commit suicide. (*Id.* at ¶ 78.) Dr. Okuleye concluded that Plaintiff needed to be upgraded to suicide watch indefinitely for his own safety. (*Id.* at ¶ 79.) Dr. Okuleye instructed mental health staff to call him if there was a need to discontinue the order for an indefinite watch. (*Id.* at ¶ 80.)

On February 24, 2021, MHP Nitsche met with Plaintiff while he was on suicide watch to assess his safety and mental health needs. (*Id.* at ¶ 81.) During the assessment, Plaintiff was argumentative and called MHP Nitsche a "bitch." (*Id.* at ¶ 82.) Plaintiff would not cooperate with the screening questions and ignored what he was asked. (*Id.* at ¶ 83.) MHP Nitsche determined that Plaintiff was at a high risk of

self-harm and maintained the suicide watch. (*Id.* at ¶ 84.)

On February 26, 2021, MHP Nitsche met with Plaintiff again while he was on suicide watch. (*Id.* at ¶ 85.) During this assessment, Plaintiff denied suicidal ideation and intent. (*Id.*) He was calm and cooperative. (*Id.* at ¶ 86.) Although Plaintiff demonstrated signs of behavioral improvement, MHP Nitsche determined that he was still at high risk for self-harm/suicide and kept him on suicide watch. (*Id.* at ¶ 87.)

The next day, on February 27, 2021, MHP Sandvick met with Plaintiff while he was on suicide watch to assess his safety and mental health needs. (*Id.* at ¶ 88.) During the assessment, Plaintiff denied suicidal ideation and intent. (*Id.* at ¶ 89.) Plaintiff was calm and cooperative. (*Id.* at ¶ 90.) MHP Sandvick determined that Plaintiff was at low risk of self-harm and suicide. (*Id.* at ¶ 91.) He notified Plaintiff that he would discuss downgrading Plaintiff's risk status with Dr. Okuleye. (*Id.* at ¶ 92.)

On March 1, 2021, Plaintiff was assessed by MHP Nitsche while on suicide watch. (*Id.* at ¶ 93.) During this assessment, Plaintiff reported that he was not suicidal and would like to be more cooperative with staff. (*Id.* at ¶ 94.) Plaintiff stated that he was never suicidal but wanted to dictate his housing. (*Id.* at ¶ 95.) With approval from Dr. Okuleye, MHP Nitsche downgraded Plaintiff to close observation status. (*Id.* at ¶ 96.)

The next day, on March 2, 2021, MHP Gier met with Plaintiff while he was on close observation status to determine if he could be discharged. (*Id.* at ¶ 97.) Plaintiff

reported that he was not suicidal and would like to be discharged. (*Id.* at ¶ 98.) Plaintiff, however, began to threaten and demand that officers and mental health staff discharge him from close observation status. (*Id.* at ¶ 99.) MHP Gier determined that Plaintiff was not stable enough to be discharged. (*Id.* at ¶ 100.)

On March 3, 2021, MHP Nitsche met with Plaintiff to determine whether he could be discharged from close observation status. (*Id.* at ¶ 101.) Plaintiff was polite and cooperative throughout the consultation. (*Id.* at ¶ 102.) Plaintiff stated that he was not thinking about harming himself or others, and that he originally said that for attention. (*Id.* at ¶ 103.) MHP Nitsche discharged Plaintiff from close observation status, noting that Plaintiff was eating and sleeping, denied suicidal ideation, plan, and intent, denied homicidal ideation, plan and intent, and was cooperative. (*Id.* at ¶ 104.)

Plaintiff was not placed on close observation or suicide watch for the remainder of March. (*Id.* at ¶ 105.) On March 11, 2021, a non-Defendant nurse met with Plaintiff after correctional staff requested that he be evaluated for need of close observation status. (*Id.* at ¶ 106.) During the consultation, Plaintiff was smiling and in good spirits. (*Id.* at ¶ 107.) He did not express any intention of harming himself. (*Id.* at ¶ 108.)

The Medical Defendants assert that while Plaintiff was on close observation status or suicide watch, he never complained to them about feces in his chuckhole or that his toilet was clogged. (*Id.* at ¶¶ 110-111.) Assuming these conditions existed, the Medical Defendants were not aware of them. (*Id.* at ¶ 112.) The Medical

Defendants support this with Declarations from Gier, Sandvick, and Nitsche. (*Id.* at ¶¶ 110-111.)

The Medical Defendants also assert that Plaintiff had no interactions with Dr. Okuleye (*see id.* at ¶ 110) but cite only to Plaintiff's medical records generally. The medical records do not support this, however, as they reflect that Dr. Okuleye evaluated Plaintiff on February 27, 2021. (*See* Dkt. No. 186 at pgs. 194-96.)

Dr. Okuleye stated that Plaintiff was currently on suicide watch due to making suicidal statements, but Plaintiff reported that he was never truly suicidal and made the statements "to manipulate his environment." (*Id.* at pg. 194.) Plaintiff reported that he had never made a suicide attempt, but Dr. Okuleye observed that a review of the records indicated that Plaintiff had attempted to hang himself on February 20, 2021. (*Id.*)

Dr. Okuleye decided to continue the suicide watch through Monday (March 1, 2021) with the mental health team to assess Plaintiff for a step down to the next observation level. (*Id.* at pg. 196.) The treatment notes do not reflect that Plaintiff expressed any concerns about his conditions of confinement. (*See id.*)

On February 24, 2021, while on suicide watch, Plaintiff filed two grievances. (Will Co. Defs.' SOF, Dkt. No. 172, at ¶ 33.) In those grievances, Plaintiff requested removal from suicide watch, asserting it was being used to punish him because he was not suicidal. (*Id.* at ¶ 34.)

In the first grievance, dated February 24, 2021, Plaintiff also complained that he was not allowed his legal work or a pencil, and that he was "extremely cold in a

paper gown suit." (*Id.* at ¶ 35.) Medical Director Briscoe reviewed at least one of Plaintiff's grievances, clarifying that the watch status was determined by clinical judgment rather than a form of punishment. (*Id.* at ¶ 36.) Another grievance response explained that Plaintiff was placed on suicide watch because he wrapped a towel around his neck and began to tie it. (*Id.* at ¶ 37.) These responses were consistent with WCADF policy, which delegated such decisions to medical professionals. (*Id.* at ¶ 38.)

Plaintiff was aware that placement on suicide watch was at the discretion of medical providers. (*Id.* at ¶ 39.) Neither Warden Santerelli nor Chief Taylor reviewed Plaintiff's grievances or had any involvement in the grievance process. (*Id.* at ¶ 40.) They had no communications with Plaintiff regarding his time on suicide watch and close observation, (*Id.* at ¶ 41.), nor were they informed of his placement or its circumstances. (*Id.* at ¶ 42.)

On March 1, 2021, Plaintiff filed another grievance, reiterating his claim that suicide watch was punitive and nothing the cold conditions in his cell, were he wore a paper gown. (*Id.* at ¶ 43.) In total, Plaintiff submitted four grievances or appeals related to the conditions on suicide watch or close observation. None of these raised issues about a clogged toilet, feces in the cell, or an unclean environment. (*Id.* at ¶ 44.)

Plaintiff testified at his deposition that he complained about those conditions to medical providers. (*Id.* at ¶ 45; *see* Pl.'s Dep., Dkt. No. 172-1, at 77:22-78:3, complaining that Dr. Okuleye and mental health staff "disregarded" Plaintiff's

complaints). At no point did any medical providers recommend to WCADF staff that Plaintiff be moved to a new cell or provided with additional accommodations due to the temperature or cleanliness of his cell. (*Id.* at ¶ 46.) Had medical providers recommended that Plaintiff be given a new cell or additional items for warmth/cleanliness, WCADF staff would have followed that recommendation. (*Id.* at ¶ 47.)

In 2021, Andrea Kelly was a classification specialist at the WCADF and was regularly assigned to be the hearing officer for incidents related to Plaintiff. (*Id.* at ¶ 48.) Kelly was the hearing officer assigned to Plaintiff's disciplinary hearings on March 10, 2021, with Sgt. Richards assisting. (*Id.* at ¶ 49.) As of March 10, 2021, Kelly had conducted several disciplinary hearings involving Plaintiff.[4] (*Id.* at ¶ 50.)

Kelly's habit and practice was to ensure that detainees, including Plaintiff, were provided with advanced written notice prior to the date of the hearing. (*Id.* at ¶ 51.) She also ensured that Plaintiff received a copy of the relevant incident reports prior to the hearing, and she did so prior to the March 10, 2021, hearing. (*Id.* at ¶ 52.)

With respect to incident report 2021-580 (involving sexual activity/insubordination), Plaintiff received the incident report on February 10, 2021, as confirmed by the incident violation investigation entry attached to Kelly's declaration. (*Id.* at ¶ 53.) With respect to incident report 2021-679 (involving throwing an unknown liquid at a pod worker), Plaintiff received the incident report

---

[4]While the disciplinary hearing involved eight tickets, Plaintiff's complaint concerned only four of these tickets, for Incident Reports 2021-580, 2021-640, 2021-879, and 2021-679. (*See* Pl.'s Compl, Dkt. No. 9, at pg. 22.)

on February 18, 2021, as confirmed by the incident violation entry attached to Kelly's declaration. (*Id.* at ¶ 54.)

Prior to the hearing, Kelly reviewed all the evidence related to the various incidents, as was her habit and practice. (*Id.* at ¶ 55.) On March 10, 2021, Kelly met with Plaintiff and discussed eight incident reports—2021-562, 2021-576, 2021-580, 2021-582, 2021-611, 2021-640, 2021-679, and 2021-879. (*Id.* at ¶ 56.) Plaintiff gave a statement with respect to each incident, and generally, stated that he disagreed with the reports. (*Id.* at ¶ 57.)

With respect to incident 2021-580, involving indecent exposure, Plaintiff stated there was no proof of the allegation because he was in his cell. (*Id.* at ¶ 58.) With respect to incident 2021-640 (involving Plaintiff having allegedly torn jail uniform shirts), Plaintiff denied the allegation that he damaged facility property and stated that he was given shirts that were already torn. (*Id.* at ¶ 59.) With respect to incident 2021-679, Plaintiff denied that he intended to throw anything at a pod worker and stated that he threw water out of his cell and hit the pod worker by mistake. (*Id.* at ¶ 60.) With respect to incident 2021-879 (involving Plaintiff allegedly masturbating in front of jail staff on March 4, 2021), Plaintiff denied the allegations and stated that he did not recall what had occurred. (*Id.* at ¶ 61.)

Sgt. Richards was present to oversee the hearing, but the substance of the hearing was handled by Kelly. (*Id.* at ¶ 62.) Plaintiff did not at any point during the hearings request to present additional evidence or call a witness other than himself. (*Id.* at ¶ 63.) Had Plaintiff presented additional evidence, Kelly would have taken it

into consideration. (*Id*. at ¶ 64.) Had Plaintiff requested to call a witness, Kelly would have asked Plaintiff about the context of the proposed witness's testimony and met separately with the witness to discuss the incident. (*Id*.) Kelly considered all the available evidence, including Plaintiff's statements, in reaching her decision as to each incident. (*Id*. at ¶ 65.) Her decisions and reasoning were provided to Plaintiff in writing. (*Id*.) Defendant Kelly determined that Plaintiff was guilty as to each incident. (*See* Kelly Decl., Dkt. No. 172-1, Ex. D, at ¶ 31.).

Plaintiff, proceeding *pro se* sued the Defendants under 42 U.S.C. §1983, alleging that medical staff at WCADF placed him on suicide watch and close observation status from February 23 through March 3, 2021, as a means of punishment. Plaintiff also alleges that during this time he was subjected to unconstitutional conditions of confinement and was deprived of due process in connection with a disciplinary hearings held on March 10, 2021. The Defendants' motions for summary judgment are before the Court.

## **LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine when a genuine dispute of material fact exists, the Court must assess the evidence in the record as presented in depositions, documents, affidavits or declarations, and other materials. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The parties seeking summary judgment bear the initial burden of showing the

grounds for their motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once they have done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The Court construes all facts in the light most favorable to the non-moving party, the Plaintiff and draw all legitimate inferences in Plaintiff's favor. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

## ANALYSIS

### I. Will County Defendants' Motion for Summary Judgment

The Will County Defendants argue that they are entitled to summary judgment because: (1) there is no evidence that either Warden Santerelli or Chief

Taylor were personally involved in the alleged violation of his rights; (2) they reasonably deferred to the judgment of medical professionals concerning Plaintiff's placement on suicide watch and/or close observation status; (3) they are entitled to qualified immunity as to Plaintiff's claims that his due process rights were violated due to his placement on suicide watch and/or close observation status; (4) Plaintiff's conditions of confinement claims fail because the Will County Defendants were not aware of the presence of fecal matter in Plaintiff's chuckhole or a clogged toilet, and did not violate Plaintiff's rights in regard to the temperature in his cell; and (5) Sergeant Richards and Hearing Officer Kelly did not violate Plaintiff's due process rights in regard to his disciplinary proceedings. The Court addresses each argument in turn.

### A. Personal Involvement

First, the Will County Defendants argue that they are entitled to summary judgment because Plaintiff has not brought forth evidence that either Warden Santerelli or Chief Taylor was personally involved in the alleged violation of his rights. The Court agrees.

To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the alleged violation of a right. *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). There is no *respondeat superior*, or supervisory, liability under § 1983; rather, a plaintiff must show that the supervisory official violated the Constitution through his own conduct. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Personal involvement can be demonstrated where the conduct

21

occurred at the defendant's direction or with his knowledge and consent. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.").

In this instance, there is no evidence that Warden Santerelli and Chief Taylor participated in, or were even aware of, the events and conditions of which Plaintiff complains. On the contrary, the undisputed evidence in the record is that these Defendants did not review Plaintiff's grievances and were not notified about Plaintiff's placement on suicide watch or the conditions in his cell. There is no evidence that Plaintiff communicated with these Defendants about the problems he contends he was facing. Accordingly, Warden Santerelli and Chief Taylor are entitled to summary judgment, and the Court need not address the issue of qualified immunity as it relates to them.

## B.      Placement on Suicide Watch/Close Observation Status

Next, as to Plaintiff's claim that he was put on suicide watch as form of punishment, the Will County Defendants contend otherwise. They argue that they are entitled to summary judgment, asserting that they reasonably deferred to the judgment of medical professionals in determining Plaintiff's placement on suicide watch or close observation status.

It is well established that jail officials may detain inmates awaiting trial but may not punish them for the offense for which they are awaiting trial. *Zarnes v. Rhodes*, 64 F.3d 285, 291 (7th Cir. 1995) (citing *Bell v. Wolfish*, 441 U.S. 520, 534–35

(1979)). Courts therefore must determine whether the complained-of conditions were imposed with an intent to punish or pursuant to a legitimate administrative purpose. *Id*. If a restriction is not reasonably related to a legitimate goal, meaning that is arbitrary or purposeless, the Court may infer that the purpose of the restriction was punishment. *Id.* (citing *Bell*, 441 U.S. at 539).

Restrictive conditions imposed as punishment for a disciplinary infraction require notice and an opportunity to be heard. *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (citing *Rapier v. Harris*, 172 F.3d 999, 1004–05 (7th Cir. 1999)). No such process is required, however, if the prisoner is placed in segregation not as punishment but for managerial reasons or because the inmate was considered a suicide risk. *Id.* "As long as the purpose was indeed a preventive rather than a punitive one, he would not be entitled to notice and a hearing. Indeed, a jail's failure to take steps to prevent harm to the prisoner or to other prisoners might give rise to meritorious suits against the jail." *Id.*

As such, the Court must determine whether restrictive conditions are imposed for the purpose of punishment or pursuant to a legitimate government purpose. *Peden v. City of Milwaukee*, No. 20-CV-1307, 2023 WL 3866335, at *6 (E.D. Wis. June 7, 2023) (citing *Bell*, 441 U.S. at 538). Absent an expressed intent to punish on the part of correctional officials, the determination will turn on whether the restrictive conditions are rationally related to a legitimate governmental purpose, and whether they appear excessive in relation to that purpose. *Id.* (citing *Bell*, 441 U.S. at 538).

Here, Plaintiff has not brought forth any evidence of an expressed intent to

23

punish on either the part of the Medical Defendants or the Will County Defendants. Rather, the record reflects that Plaintiff was put on suicide watch on February 20, 2021, after attempting to hang himself from a second-story railing with a bedsheet.

This occurred thirty minutes after Plaintiff was taken off close observation status, a status he was placed on following threats to harm himself. Such behavior did not occur in a vacuum either, as the record reflects that Plaintiff reported multiple mental health diagnoses upon entry to the jail and had made comments and gestures indicating that he was suicidal in the months prior, including in the week leading up to the complained-of events.

Plaintiff subsequently was downgraded to close observation status, but upgraded again to suicide watch after his belligerent and argumentative consultation with MHP Nitsche on February 23, 2021. Plaintiff then remained on suicide watch until March 1, 2021, when he was downgraded to close observation status. Thereafter, he was removed from close observation status on March 3, 2021, following his cooperation with staff and denial suicidal ideations or plans.

During this period of time, Plaintiff was evaluated daily or nearly daily, and the record reflects that his behavior during these evaluations was at times erratic and/or inappropriate. As will be discussed below in regard to the Medical Defendants' motion, the Medical Defendants took reasonable steps to protect Plaintiff as a result of his own behavior, which indicated that he was at risk of self-harm.

In any event, the record reflects, and Plaintiff acknowledged during his deposition testimony, that correctional staff deferred to the judgment of mental

health workers in determining when to place inmates on suicide watch and when to remove them. (*See* Pl.'s Dep., Dkt. No. 172-1, Ex. E, at 81:5-7 ("[o]nly mental health staff" could place a detainee on suicide watch)). The Will County Defendants were entitled to defer to the judgment of the jail's mental health staff as to the appropriateness of Plaintiff's placement on suicide watch or similar status. *See Berry v. Peterman*, 604 F.3d 435, 440–41 (7th Cir. 2010) (non-medical administrator was entitled to defer to the judgment of jail health professionals so long as he did not ignore the inmate).

As the Seventh Circuit stated in *Berry*, an Eighth Amendment case, "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Id.* at 440. The same principle has been applied to Fourteenth Amendment constitutionally inadequate medical care claims. *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (holding that correctional staff may defer to the medical judgment of doctors and nurses, unless the correctional staff had reason to know that the medical staff was failing to treat or inadequately treating the detainee).

No evidence in the record indicates that the Will County Defendants had any reason to think that healthcare providers were mistreating Plaintiff. Plaintiff admitted in his deposition testimony that he made comments that indicated that he was at risk of self-harm, although he stated that his purpose in doing so was to get staff to pay attention to his concerns. (*See* Pl.'s Dep., Dkt. No. 172-1, Ex. E, at 18:10-

20:9 (Plaintiff acknowledging that he may have said some "extreme things" to get staff to pay attention to him)).

Further, as set forth above, the medical records reflect Plaintiff's erratic behavior and threats of self-harm during the relevant period. When Plaintiff filed grievances about his placement on suicide watch, the Will County Defendants did not ignore them. Sgt. Richards referred the issue to the facility's medical director, who informed Plaintiff that his placement was based on clinical judgment. (*See* Richards Decl., Dkt. No. 172-1, Ex. B, at ¶¶ 6-16.) Nothing more is required under the law, and the Will County Defendants are therefore entitled to summary judgment on this claim. As such, the Court need not consider Defendants' alternative argument that they are entitled to qualified immunity.

## C. Plaintiff's Conditions of Confinement Claims

The Will County Defendants next argue that Plaintiff's conditions of confinement claims fail because the Will County Defendants were not aware of the presence of fecal matter in Plaintiff's chuckhole or a clogged toilet, and did not violate Plaintiff's rights in regard to the temperature in his cell.

Because Plaintiff was a pretrial detainee at the relevant time, his conditions of confinement claims are governed by the objective reasonableness standard found in the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019). This standard requires Plaintiff to bring forth evidence that: (1) the conditions in question were objectively serious; (2) the defendants acted "purposefully, knowingly, or

recklessly with respect to the consequences of [their] actions"; and (3) defendants' actions were "objectively unreasonable -- that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 398).

In determining whether a plaintiff has met this standard, courts consider the totality of the circumstances, including the duration and severity of the plaintiff's exposure to the allegedly unconstitutional conditions. *Id.* at 824.

Correctional facilities must provide detainees with "'the minimal civilized measure of life's necessities.'" *Hardeman*, 933 F.3d at 820 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). This includes "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Id.* (cleaned up). With regard to the severity of the conditions, the Seventh Circuit has not specified exactly how severe the deprivation must be to implicate the Due Process Clause. *See Caldwell v. Woock*, 2023 WL 3582349, at *4 (W.D. Wis. May 22, 2023). But the Seventh Circuit has indicated "an equivalence" of the Eighth Amendment standard as to what constitutes an objectively serious deprivation. *Id.* (citing *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (applying substantial risk of serious harm standard to Fourteenth Amendment failure-to-protect claim); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (applying serious medical need for a Fourteenth Amendment medical care claim)); *see also Dyjak v. Harper*, 2023 WL 5928160, at *3 (7th Cir. Sept. 12, 2023) (unreported) (requiring evidence of an "objectively serious threat" in detainee's conditions of confinement case).

27

Here, as the Will County Defendants argue, the undisputed evidence is that they were unaware of Plaintiff's complaint of fecal matter in the chuckhole of his cell, or his toilet being clogged. None of Plaintiff's four grievances or appeals mention anything about these issues. Plaintiff's testimony reflects only that he complained about these alleged conditions to mental health staff, not the correctional defendants. (*See* Pl.'s Dep., Dkt. No. 172-1, Ex. E, at 77:22-78:3.)

Further, Warden Santerelli, Chief Taylor, and Sgt. Richards averred that they were not aware of these alleged conditions, and they cannot be held liable based on their supervisory positions at the jail. *See Kemp v. Fulton Cnty.*, 27 F.4th 491, 497–98 (7th Cir. 2022); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Accordingly, the Will County Defendants are entitled to summary judgment as to the allegedly unsanitary conditions in Plaintiff's cell.[5]

However, the Court must address Plaintiff's complaint regarding his cell's temperature and the paper gown his was given to wear while on suicide watch. Indeed, Plaintiff raised these concerns in his February 24, 2021 grievance, stating that he was "extremely cold in a paper gown suit." And while the undisputed evidence is that Warden Santerelli and Chief Taylor had no knowledge of the conditions in Plaintiff's cell, this complaint did reach Sgt. Richards.

First, as to his cell temperature, it is well settled that pretrial detainees have a right to protection from extreme cold. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th

---

[5]As noted below in regard to the Medical Defendants, the Court also observes that Plaintiff has not come forth with any evidence as to the duration and severity of these conditions, which also supports the grant of summary judgment.

Cir. 1996). In assessing claims based on low cell temperature, courts consider several factors, including the severity of the cold, its duration, whether the prisoner has alternative means to protect himself from the cold, the adequacy of those alternatives, and whether he also was subjected to other uncomfortable conditions in addition to the cold. *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). No one factor or combination of factors is necessarily determinative. *Id.*

Here, there is no evidence in the record indicating that Plaintiff's cell was abnormally cold, that the allege cold persisted for a significant duration, or that the temper in his cell was so low as to be deemed severe. In fact, the evidence indicates that the cell temperature was controlled by a heating and cooling system that kept the cell at room temperature. Moreover, Plaintiff offered no evidence as to what he believed the temperature was at the relevant time. (*See* Pl.'s Dep., Dkt. No. 172-1, Ex. E, at 71:23-73:14.) Accordingly, summary judgment is granted in favor of the Will County Defendants as the Plaintiff's claims regarding his cell temperature. *See also Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) (Conditions of confinement claims are "fact-intensive" and generally "require[] the development of a factual record.").

Next, regarding Plaintiff's complaint that he had only a paper gown for warmth when he was on suicide watch and did not have a blanket or other bedding, the Court similarly finds such related claims unavailing.

Generally, the Court must, in assessing the totality of the circumstances, defer to correctional administrators in matters affecting safety and security. *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020). It is well recognized that limiting an inmate's

clothing and bedding while on suicide watch serves legitimate penological reasons. *See Myers v. Cnty. of Lake, Ind.*, 30 F.3d 847, 850 (7th Cir. 1994) (acknowledging that necessary precautions on suicide watch, including removal of sheets, blankets and clothing, are "unpleasant.").

Here, Plaintiff's claims are similar to those brought in *Wood v. Milwaukee Cnty.*, 2023 WL 5348344, at *1 (7th Cir. Aug. 21, 2023) (unreported). In *Wood*, an inmate brought suit after he spent three days in the Milwaukee County Jail enduring "unpleasant conditions," including having to wear only a suicide smock, flooding in his cell, and the presence of a feces-stained mattress. *Id*. at 2. At one point, plaintiff complained about those conditions to a sheriff's lieutenant, who issued him a new mattress, but did not bring him a blanket or change his cell assignment because he was on suicide watch. Affirming the grant of summary judgment to defendants, the Seventh Circuit found that no reasonable jury could find that denying plaintiff's requests for a blanket and a different cell was objectively unreasonable given that the plaintiff was on suicide watch. *Id.* The Court finds *Wood* instructive.

As set forth above, Sgt. Richards, the only correctional Defendant who received Plaintiff's grievances, reasonably deferred to the judgment of medical staff regarding Plaintiff's placement on suicide watch. Assuming that Plaintiff's complaint about being "extremely cold in a paper gown suit" was sufficient to alert Sgt. Richards to an objectively serious deprivation (which the Court does not find), Sgt. Richards reacted reasonably given that jail policy dictated that inmates on suicide watch were limited to a paper gown for their own protection. For these reasons, the Will County

Defendants are granted summary judgment on Plaintiff's conditions of confinement claims.

### D. Plaintiff's Disciplinary Hearing Claims

As previously noted, Plaintiff alleges that Sgt. Richards and Kelly denied him due process in connection with several disciplinary hearings that were conducted by Defendant Kelly on March 10, 2021.

Plaintiff's allegation is rooted in the well-established principle that pretrial detainees cannot be punished in any manner for the crime for which they are charged. *Rapier*, 172 F.3d at 1002. However, they may be subject to punishment for misconduct committed during their pretrial detention, provided that they receive procedural due process. *Id.* at 1005.

Procedural due process in this context is satisfied when the following requirements are met: (1) the issuance of at least 24 hours advance written notice of the charge; (2) a limited opportunity to call witnesses and present evidence to an impartial decision-maker; (3) a written statement articulating the reasons for the disciplinary action and the evidence justifying it; and (4) "some evidence in the record" to support the finding of guilt. *Bowyer v. Warden*, 2020 WL 7398665, at *1 (S.D. Ind. Dec. 16, 2020) (citing *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985)); *see also Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974).

Moreover, the harmless error analysis applies to alleged procedural due process violations in correctional disciplinary proceedings. *Groves v. Milwaukee Cnty. Jail*, 2008 WL 515006, at *11 (E.D. Wis. Feb. 25, 2008) (citing *Piggie v. Cotton,* 344

31

F.3d 674, 678 (7th Cir. 2003)). Thus, claims predicated on a lack of procedural due compliance will fail if the plaintiff cannot demonstrate that the alleged error (here, untimely notice) prejudiced their ability to mount a defense. *Id; see Brennan v. United States,* 646 F. App'x. 662, 666 (10th Cir. 2016) (unpublished) (24-hour notice requirement is subject to harmless error review); *see also Bailey v. Holt*, 2024 WL 1299770, at *8 (S.D. Ill. Mar. 27, 2024) (due process claim failed because plaintiff failed to show how alleged inability to present evidence would have affected the outcome of the hearing).

Here, Plaintiff alleged in his complaint that he did not receive 24-hour advance written notice of the hearing for two of the disciplinary charges, 2021-679 and 2021-580. (*See* Pl.'s Compl., Dkt. No. 9, at pg. 22.) However, Kelly attests that she received notice of the relevant incident reports at some point prior to March 10, 2021, and at that time ensured that Plaintiff had received a copy of the incident reports, including by sending him copies of each report that would be discussed at the hearing. Records attached to Kelly's Declaration show that Plaintiff received these incident reports on Feb. 10 and Feb. 18, 2021. (*See* Kelly Decl., Dkt. No. 172-1, Ex. D, at ¶¶ 15-18 and Ex. 1 to the Declaration). Plaintiff has not presented evidence disputing these facts or explaining how the purported lack of 24-hour notice impaired his ability to prepare a defense.

As such, the alleged lack of notice cannot serve as a basis for Plaintiff's due process claim. At the summary judgment stage, Plaintiff may not rely solely on allegations in his complaint and must instead point to evidence supporting his

position. *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017) ("[T]he plaintiff is required to point to evidence."). Even assuming notice was insufficient, Plaintiff has failed to demonstrate that this deficiency constituted more than harmless error. *Brennan*, 646 F. App'x. at 666.

Plaintiff next asserts a due process claim in connection with four of the disciplinary tickets: 2021-580, 2021-640, 2021-879, and 2021-679. Specifically, he alleges that there was no evidence to support the finding of guilt. (*See* Pl.'s Compl., Dkt. No. 9, at pg. 22.) This allegation, however, is not substantiated by the record.

Under established precedent, a hearing officer's decision need only be supported by "some evidence", *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007), to satisfy due process requirements. This standard is met if any evidence in the record could support the conclusion reached by the hearing officer. *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000). This threshold is minimal, requiring only that the evidence "bear some indicia of reliability." *Scruggs*, 485 F.3d at 941.

Starting with Incident 2021-580, the incident report reflects the following: On February 10, 2021, Deputy Tynski was alerted by a nurse to look into Plaintiff's cell, where he saw Plaintiff masturbating. Deputy Moore, over the intercom, ordered Plaintiff to stop, and Plaintiff responded, "No, bitch." Lt. Perillo then approached Plaintiff's cell, and Plaintiff immediately stopped. When Deputy Tynski entered the dayroom and told Plaintiff to be respectful, Plaintiff responded, "I'm an inmate. You need to get your big booty bitch out of here." (*See* Dkt. No. 172-1, Ex. J, at pgs. 166-68.) Plaintiff's response to this at the disciplinary hearing was to state that he was

accused of doing something in his cell, but there was no proof because he was in his cell. (*See id.* at pg. 167.)

Despite Plaintiff's denial, Defendant Kelly relied on the officer's report, the sergeant's investigation, and Plaintiff's statement to find him guilty of sexual activity and insubordination. The Court finds that the hearing officer's decision was supported by sufficient evidence, meeting the "some evidence" standard.

As to Incident 2021-0640, the incident report reflects that Deputy Quigley reported that while conducting the laundry exchange on February 15, 2021, Plaintiff asked for a different sized shirt. Deputy Quigley gave it to him, but a short while later he discovered that Plaintiff had torn both shirts. Deputy Quigley reported that Plaintiff said the shirts were a "bogus color" and he needed to match. (*See* Dkt. No. 172-1, Ex. J, at pgs. 175-76.) Plaintiff's response at the hearing was that the shirts were already torn. (*See id.* at pg. 175.)

Although Plaintiff claimed the shirts were already torn, Defendant Kelly found Plaintiff guilty of damage to facility property based on the officer's report, the sergeant's investigation, and Plaintiff's statement. (*See id.*) Similarly, this finding was supported by evidence that satisfied the requisite standard.

Regarding Incident 2021-679, Deputy Reidl reported that on February 18, 2021, after Plaintiff took his lunch tray, he threw an "unknown liquid" at a pod worker. When Deputy Reidl asked Plaintiff why he would do that, he responded, "It's what I do. I'm Terrence Williams." Deputy Reidl also reported that Plaintiff began yelling and banging on his cell door, threw items from his cell, and kicked the cell

window repeatedly until it broke. (*See* Dkt. No. 172-1, Ex. J, at 177-179.) Plaintiff stated at the disciplinary hearing that he threw water out of his cell, and it hit the pod worker by mistake. (*See id.* at pg. 178.) The report also reflects that Plaintiff admitted to these events, and they could be seen on facility video. (*See id.*)

Defendant Kelly found Plaintiff guilty of several violations, including damage to facility property, after reviewing the officer's report, the sergeant's investigation, and Plaintiff's statement. (*See id.*) Here, the Court finds that hearing officer's decision to find Plaintiff guilty of multiple violations was supported by ample evidence, including the Plaintiff's own admission.

Finally, as to Incident 2021-0879, the incident report reflects that a mental health worker reported that Plaintiff was masturbating in the dayroom on March 4, 2021. Deputy Tynski went on the intercom and directed Plaintiff to stop, at which point Plaintiff asked him, "What are you talking about?" Deputy Tynski told Plaintiff that he knew what he was doing and would be ordered to lock up if he did not stop. (*See* Dkt. No. 172-1, Ex. J, at pgs. 180-81.) Plaintiff stated at the disciplinary hearing that he did not recall the incident. (*See id.* at pg. 181.)

Defendant Kelly found Plaintiff guilty of sexual activity after reviewing the officer's report, the sergeant's report, and Plaintiff's statement, and he received 15 days in disciplinary confinement. (*See id.*) Here, too, the record clearly shows that the hearing officer's decision was supported by sufficient evidence.

On the whole, the record as set forth above shows that there was "some evidence" to support the finding of guilt for each of the disciplinary charges (tickets:

35

2021-580, 2021-640, 2021-879, and 2021-679) with which Plaintiff took issue. For each disciplinary ticket, the hearing officer's findings met the minimal evidentiary standard required under due process. Consequently, the Court rejects Plaintiff's assertion that the findings were unsupported.

Plaintiff next alleged in his complaint that Kelly "deliberately refused to appreciate my rejection of those tickets and my evidence that worked in my favor." (*See* Pl.'s Compl., Dkt. No. 9, at pg. 22.) However, as the record establishes, the disciplinary reports considered by Defendant Kelly were not particularly complex. And in each instance, she reviewed the relevant evidence, including Plaintiff's denials, and found against him. Due process did not require anything more. *See Culbert v. Young*, 834 F.2d 624, 631 (7th Cir. 1987) (disciplinary committee's reference to conduct report as basis for each decision sufficed when "the only issue presented at the hearing involved an assessment of the relative credibility of the conduct report and the plaintiff's account of the incident.").

In sum, Plaintiff has not brought forth any evidence that Kelly or Sgt. Richards (who based on the evidence did not play an active role in these hearings) violated his right to due process. Therefore, Sgt. Richards and Kelly are entitled to summary judgment on this claim.

Taking everything into account, the Will County Defendants are entitled to summary judgment on all claims raised by Plaintiff.

## II. Medical Defendants' Motion for Summary Judgment

In seeking summary judgment, the Medical Defendants argue: (1) the

36

undisputed facts show they did not subject Plaintiff to suicide watch or close observation status as punishment; (2) Plaintiff was not subjected to unconstitutional conditions of confinement while on watch status; (3) Defendants were not aware of the allegedly unsanitary conditions of Plaintiff's cell; and (4) There is no evidence that Plaintiff's cell was abnormally cold, and the removal of clothing and bedding was necessary to protect Plaintiff while he was on watch status. The Court addresses each argument in turn.

### A. Placement on Suicide Watch/Close Observation Status

As outlined above, the undisputed facts show that Plaintiff was placed on suicide watch and/or close observation status to ensure his safely and mitigate the risk of self-harm.

Courts have recognized that taking reasonable steps to prevent a detainee from committing suicide serves a legitimate governmental purpose. *Comiskey v. Brown*, 2009 WL 2163465, at *16 (C.D. Ill. July 14, 2009) (citing *Rapier v. Kankakee Cnty., Ill.*, 203 F. Supp. 2d 978, 984 (C.D. Ill. 2002)). In fact, the failure to do so would amount to deliberate indifference. *See Rapier*, 203 F. Supp. 2d at 984; *see also Boncher ex rel. Boncher v. Brown Cnty.*, 272 F.3d 484, 486 (7th Cir. 2001) ("Jail managers who decided to take no precautions against the possibility of inmate suicide—to have no policy, for example no suicide-watch option—would be guilty of deliberate indifference in the relevant sense . . . [as] they would be ignoring a known and serious risk of death of persons under their control for whose safety they are responsible.").

Here, the undisputed evidence establishes that Plaintiff's placement on suicide

watch and changes in status were prompted by his own erratic behavior, which must be contextualized within his mental health diagnoses, his history of self-harm threats, and his attempt to hang himself with a bed sheet on February 20, 2021. *See supra*. These actions reasonably warranted heightened precautions. *Id*. Moreover, the record further reflects that Medical Defendants adjusted Plaintiff's observation status when he demonstrated cooperation and exhibited behavior indicating he was no longer a threat to himself or others. *Id*.

Plaintiff's retrospective contention that he did not intend to harm himself fails to render his placement on suicide watch unconstitutional. The Medical Defendants' actions were driven by legitimate concerns for Plaintiff's safety and were not punitive in nature. Plaintiff has provided no evidence to suggest otherwise.

Because the undisputed facts establish that Plaintiff's placement on suicide watch and/or close observation status was based on safety considerations rather than punitive intent, the Medical Defendants are entitled to summary judgment on this claim.

### B. Plaintiff's Conditions of Confinement Claims

To begin, in regard to the alleged cold temperatures in Plaintiff's cell, the Medical Defendants argue that they are entitled to summary judgment for the reasons regarding the same claim against the Will County Defendants. The Court agrees.

First, as articulated above, even if the Medical Defendants knew about this condition (Gier, Nitsche, and Sandvick say they did not), it did not rise to the level of

a constitutional violation, as there is no evidence in the record that Plaintiff's cell was abnormally cold.

Second, as the Court explained previously, Plaintiff's justified placement on suicide watch necessarily resulted in the removal of most of his clothing and blankets for his own protection. *See Butler v. Meyers*, 2012 WL 996604, at *4 (E.D. Wis. Mar. 23, 2012) (observing that plaintiff's conditions of confinement had to be considered in the context of his status on suicide watch, which required the removal of his property and clothing).

Next, regarding Plaintiff's complaints about fecal matter in his chuckhole and a clogged toilet, courts recognize that access to a functioning toilet "is among the minimal civilized measure of life's necessities." *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012). Moreover, long-term or extreme exposure to human waste presents health concerns. *See Cobain v. McLaughlin*, 717 F. App'x. 605, 611 (7th Cir. 2017) (unpublished). And while the Seventh Circuit has held that a single clogged toilet does not violate the Constitution, conditions leading to of physical illness caused by severe, prolonged unsanitary circumstances can state a claim. *Hardeman*, 933 F.3d at 823–24.

True, Plaintiff's allegations of a clogged toilet and feces in his cell were sufficient to proceed at the screening stage. However, at this juncture, courts evaluate such claims by assessing the duration, severity, and harm caused by the alleged conditions to determine their objective seriousness. *Hardeman*, 933 F.3d at 824; *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). Here, the record provides scant

evidence on these critical factors.

As for clogged toilet, Plaintiff's deposition reveals limited detail. Plaintiff testified that staff provided toilet paper during his time on suicide watch but occasionally failed to prove enough to cover the toilet seat, which upset him. (*See* Pl.'s Dep., Dkt. No. 172-1, Ex. E, at 74:1-19.) However, Plaintiff did not indicate that he lacked access to a toilet at any time or that the clogged condition persisted for significate period, nor did he describe any harm resulting from it. (*See id.*)

As for the alleged feces in his chuckhole, Plaintiff testified that he observed feces in the chuckhole of his cell since 2018, despite cleaning efforts by a crew. (*Id.* at 77:3-21.) While Plaintiff noted that his meals were passed through the chuckhole, he did not explain whether his food came in contact with the feces, nor did he indicate that he was unable to eat due to this. (*See id.*) Without evidence of harm or tangible connection to basic deprivation, these allegations fall short of establishing objectively serious conditions. *Hardeman*, 933 F.3d at 824; *Thomas*; 697 F.3d at 614.

Ultimately, the record does not support a finding that the conditions in Plaintiff's cell, while uncomfortable and less than ideal, crossed the constitutional threshold of a deprivation of basic necessities, even assuming Plaintiff reported these alleged conditions to the Medical Defendants (again Gier, Nitsche, and Sandvick say he did not).

Summary judgment is the "put up or shut up" moment in a lawsuit, and requires the non-moving party to identify specific, admissible evidence showing a genuine dispute of fact. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir.

2017). Plaintiff, however, has not done so here. That is, he has not substantiated his claims regarding the conditions of his confinement nor refuted the Medical Defendants' assertion that they were unaware of these conditions. Accordingly, based on the record evidence, the Court grants summary judgment in favor of the Medical Defendants on this claim.

## CONCLUSION

For the foregoing reasons, the Will County Defendants' motion for summary judgment [170] is granted. The Medical Defendants' motion for summary judgment [176] is granted. Both sets of Defendants' motions to deem their factual statements admitted [193] [195] are granted to the extent those facts were properly supported by the record. Plaintiff's motion to reopen the case [200] is denied. The Clerk is directed to enter final judgment and send a copy of this order to Plaintiff. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1).

Date: 3/24/2025

_____
United States District Judge
Franklin U. Valderrama